FILED

2018 Feb-16  AM 09:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| vs. | **CASE NO. 2:17-CR-00419-AKK-TMP** |
| JOEL IVERSON GILBERT, STEVEN GEORGE McKINNEY, DAVID LYNN ROBERSON, | |
| Defendants | |

## DEFENDANTS' JOINT MOTION TO DISMISS THE INDICTMENT AND MEMORANDUM IN SUPPORT THEREOF

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

STATEMENT ....................................................................................................5

LEGAL STANDARD .........................................................................................9

ARGUMENT ...................................................................................................10

I.  The Alleged Conduct Does Not Constitute Bribery As A Matter Of Law........10

    A.  The Indictment Fails To Allege Honest-Services Bribery
        (18 U.S.C. § 1343, 1346) ...............................................................10

        1.  Bribery Requires "Official Action" ..................................13

        2.  The Indictment Fails to Allege Official Action.............15

        3.  A Symbolic Vote on a Non-Binding Resolution Is Not
           Official Action ....................................................................20

    B.  The Indictment Fails To Allege Federal-Program Bribery
        (18 U.S.C. § 666) ...........................................................................23

II.  The Indictment Violates The First Amendment And The Rule of Lenity........28

    A.  The Indictment Fails to Allege The "Explicit" Quid Pro Quo
        Required For An Indictment Based on Protected Political Activity .......28

    B.  The Rule of Lenity Prohibits The Government From Stretching
        the Bribery Code To Reach the Conduct Alleged Here ..........................30

CONCLUSION ................................................................................................32

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*Buckley v. Valeo,*
424 U.S. 1 (1976) ............................................................................................29

*Cleveland v. United States,*
531 U.S. 12 (2000) .................................................................................. 30, 31

*Leocal v. Ashcroft,*
543 U.S. 1 (2004) ............................................................................................26

*McBoyle v. United States,*
283 U.S. 25 (1931) .........................................................................................31

*McCormick v. United States,*
500 U.S. 257 (1991) .......................................................................................29

*McDonnell v. United States,*
136 S. Ct. 2355 (2016) ............................................................................*passim*

*McNally v. United States,*
483 U.S 350 (1987) .................................................................................. 11, 22

*Minnesota State Bd. For Community Colleges v. Knight,*
445 U.S. 271 ...................................................................................................28

*Morse v. Frederick,*
551 U.S. 393 (2007) .......................................................................................28

*Roberts v. U.S. Jaycees,*
468 U.S. 609 (1984) .......................................................................................28

*Skilling v. United States,*
130 S. Ct. 2896 (2010) .........................................................................4, 12, 30

*Skilling v. United States*,
    561 U.S. 358 (2010) ........................................................ 11, 12, 23

*United States v. Bobo*,
    344 F.3d 1076 (11th Cir. 2003) ........................................................ 9

*United States v. Cure*,
    804 F.2d 625 (11th Cir. 1986) ........................................................ 9

*United States v. Fernandez*,
    722 F.3d 1 (1st Cir. 2013) ........................................................ 24

*United States v. Jimenez*,
    705 F.3d 1305 (11th Cir. 2013) ........................................................ 30

*United States v. Langston*,
    590 F.3d 1226 (11th Cir. 2009) ........................................................ 27

*United States v. Peterson*,
    544 F. Supp. 2d 1363 (M.D. Ga. 2008) ........................................................ 10

*United States v. Siegelman*,
    640 F.3d 1159 (2011) ........................................................ 29

*United States v. Silver*,
    864 F.3d 102 (2d Cir. 2017) ........................................................ 17, 18, 19

*United States v. Sunia*,
    643 F. Supp. 2d 51 (D.D.C. 2009) ........................................................ 24

*United States v. Svete*,
    556 F.3d 1157 (11th Cir. 2009) ........................................................ 31

*United States v. Urciuoli*,
    513 F.3d 290 (1st Cir. 2008) ........................................................ 17

*United States v. Whitfield*,
    590 F.3d 325 (5th Cir. 2009) ........................................................ 26, 27

*Waste Mgmt of La, LLC v. River Birch, Inc.*,
    2017 WL 3279455 (E.D. La. 2017) ........................................................ 23

**STATUTES**

18 U.S.C. § 201(a)(3) ...........................................................................13

18 U.S.C. § 666 ............................................................................*passim*

18 U.S.C. § 666(a)(2) ...................................................................24, 25

18 U.S.C. § 1343 ...........................................................................*passim*

18 U.S.C. § 1346 ...........................................................................*passim*

**OTHER AUTHORITIES**

Ala. Code § 36-25-10 ...............................................................3, 22, 23

Ala. Const. § 43 ..............................................................................27

Alabama Ethics Law ....................................................................7, 22

FED. R. CRIM. P. 7(c)(1) ................................................................9

FED. R. CRIM. P. 12(b)(3)(B)(v) ..................................................9

**INTRODUCTION**

All Defendants in this matter jointly move to dismiss the Indictment because it rests on a sweepingly overbroad and legally incorrect reading of the federal bribery laws and seeks to punish the accused for engaging in constitutionally protected speech in opposition to a federal agency. Its allegations fail to state a criminal offense.

Acting through outside counsel at Balch & Bingham, the Drummond Company hired the Oliver Robinson Foundation (the "Foundation") to lead a public education and advocacy campaign against a plan by the EPA to take certain regulatory actions regarding the 35th Avenue Superfund Site (the "Site") in north Birmingham. Specifically, the EPA had proposed to give the Site a "priority" designation reserved for the country's most toxic areas, and to expand the Site to cover two new areas (the City of Tarrant and the Inglenook neighborhood in Birmingham). Oliver Robinson and his Foundation were natural allies of Defendants on this issue: Like many other leaders of the local community, they were concerned that the supposed pollution in these areas had been vastly overblown by ideological activists, and that stigmatizing these neighborhoods as a toxic wasteland would accomplish nothing more than devastating property values and sinking the local economy.

As noted in the Indictment, "the contract between Balch & Bingham and the Oliver Robinson Foundation" provided for the Foundation and "other individuals" to "communicate[] . . . to the residents of north Birmingham" their "opposition to EPA's actions." Indictment ¶ 62. The Foundation was hired to—and did in fact—conduct real

1

work in the community in an area outside of Robinson's legislative district. Pursuant to the contract, it "communicated with the residents through an organization formed for that purpose." *Id.* To help with the effort, the Foundation hired workers to print flyers, knock on doors, and educate the public about the risks of the Superfund plan.

At the same time, Robinson engaged in other activities that were consistent with his expressed personal views about the EPA's proposed actions. He wrote letters to and attended a hearing of a state administrative agency, where he truthfully said he had "yet to see any information that shows me that this area should be designated as a Superfund site." Indictment ¶ 58. He also "met" and "discuss[ed] issues related to north Birmingham" with officials at the EPA, *id.* ¶ 38, the governmental body with ultimate decision-making authority over the Superfund plan. Meanwhile, the vast majority of Alabama legislators and executive officials had long since come to the independent conclusion that the Superfund plan was ill-advised, and in 2016 the EPA abandoned its proposal to expand the Superfund site after concluding that Tarrant and Inglenook contained no harmful pollution warranting EPA action after all.

The federal government is now prosecuting a Drummond executive and two of the Balch attorneys who opposed the Superfund plan. According to the Indictment, Defendants' hiring of the Foundation to advocate and educate about the Superfund plan was unlawful "bribery" under 18 U.S.C. § 1346 and § 666. *See* Indictment ¶¶ 63-66. The theory of the Indictment is that because Robinson was a part-time legislator, that transformed his (and his Foundation's) constitutionally protected issue advocacy

into unlawful "official action" designed to "influence" the state's "business" in taking a position on the EPA's Superfund plan.

The government has significantly overreached, and its Indictment must be dismissed as a matter of law. As the Supreme Court recently held in *McDonnell v. United States*, "bribery" requires paying a public official for an "official act" involving some "formal exercise of governmental power." 136 S. Ct. 2355, 2372 (2016). Here, however, even if the government could prove that Defendants paid Robinson to oppose the EPA's Superfund plan, the actions that he allegedly took were not "official actions" because they did not invoke the official powers of his office.

Hiring a part-time state legislator (or an affiliated non-profit) to engage in advocacy on a matter of public policy is commonplace and fully protected by the First Amendment. Indeed, many of Alabama's part-time legislators represent clients in their private capacities as lawyers, consultants, or lobbyists. Alabama law expressly permits them to do so, "for a fee," before any "executive department." Ala. Code § 36-25-10. Such a representation may trade on the legislator's reputation or prestige, but it does not amount to bribery because it does not corrupt the "official" powers of any public office. Issue advocacy cannot possibly qualify as unlawful "official action" under § 1346, nor can it be punished as an illegal act of a state "agent" "in connection with" state "business" under § 666. While the failure to disclose a conflict of interest in this situation may have been a violation of state disclosure laws by Robinson (although not

by Defendants), it could not have violated the federal bribery laws, as the Supreme Court unanimously held in *Skilling v. United States*, 130 S. Ct. 2896, 2932–33 (2010).

Tellingly, at the press conference announcing the charges in this case, a reporter pointed out that there have been "a number of situations where public officials have had these consulting contracts" to advocate on behalf of private clients regarding state policy, and asked "Where is the line?"   In his response, U.S. Attorney Jay Town admitted: "I don't know where the line is, but I know [this is] on the other side of it." *See* Appendix A ("Town Tr.") at 26-27 attached. The government has thus conceded that its theory leaves no clear line between constitutionally protected advocacy and unlawful bribery.

Under a properly limited reading of the law, the only act alleged in the Indictment that could even conceivably qualify as "official action" is Robinson's committee vote on a symbolic, non-binding resolution to be sent for consideration by the full Alabama House opposing the Superfund plan. That single vote by itself, however, cannot remotely sustain the government's case. Not only is such a non-binding, hortatory resolution not a "formal exercise of governmental power" under *McDonnell*, 136 S. Ct. at 2372, but the Indictment fails to allege any facts tying this vote to any payments made by Defendants. It is not enough to allege that they hired an affiliated non-profit to engage in advocacy work on a related topic at roughly the same time. To avoid chilling such core First Amendment activity, the government must adduce concrete factual

4

allegations capable of proving that Defendants paid Robinson specifically *for his vote*. Because the Indictment fails to make any such concrete allegations, it must be dismissed.

## STATEMENT

This case arose out of efforts by a private company, assisted by its outside counsel, to engage in community outreach and issue advocacy against the EPA's plan to take two regulatory actions related to the 35th Avenue Superfund Site in north Birmingham (the "Superfund plan"). First, the EPA proposed to list the Superfund Site on the "National Priorities List," which is reserved for the areas in the country with the most serious pollution ("the NPL Listing Proposal"). And second, the EPA proposed to expand the Superfund site to cover the City of Tarrant and the Inglenook neighborhood ("the Site Expansion Proposal"). *See* Indictment ¶¶ 7-9. The Indictment alleges that companies determined to be responsible for pollution within the Site "could have faced tens of millions of dollars in cleanup costs and fines." *Id.* at ¶ 7.

From the start, the EPA's Superfund plan was deeply unpopular in Alabama. It was opposed not only by the local business community but also by the Governor, the Attorney General, the state legislature, and the state's environmental regulators. Indeed, in September, 2014—well before the alleged "bribery scheme" in this case took place— the Alabama Department of Environmental Management (ADEM) sent a letter to the EPA stating emphatically: "The State **DOES NOT CONCUR** in the proposed [NPL] listing for numerous reasons." *See* Appendices B & C attached.

5

Like many others, the Drummond Company strongly opposed the EPA's Superfund plan on scientific, economic, and policy grounds. In its view, the alleged pollution in north Birmingham had been vastly overstated by EPA and environmental activists relying on flawed scientific studies. In fact, as EPA subsequently determined, there was no harmful pollution in Tarrant or Inglenook warranting EPA action. Many local community leaders agreed, and believed the Superfund plan was an ideological crusade that ignored the interests of local residents, whose property values stood to be substantially harmed if the Superfund plan went forward.

To help advance the political and legal fight against the Superfund plan, several Drummond executives consulted with the company's outside counsel at Balch & Bingham, a Birmingham law firm. On behalf of the Drummond Company, Balch & Bingham hired the Oliver Robinson Foundation to help educate the public about, and advocate against, the Superfund plan. Indictment ¶ 14. The Foundation was well-known in Birmingham and had prior experience in community outreach and education campaigns. It was founded by and affiliated with Oliver L. Robinson, Jr., a part-time legislator in the Alabama State House of Representatives who represented a district that did not include the Site or any of the areas being considered by EPA under the Site Expansion Proposal.  Robinson was a natural political ally of the Drummond Company on the Superfund issue because he too opposed the Superfund plan as contrary to the interests of local residents.

6

The standard contract between Balch & Bingham and the Foundation is no different from myriad other agreements routinely entered into by law firms across the country to engage in vigorous issue advocacy on behalf of their clients. The Foundation was retained for, among other things, the "collection and dissemination of information" regarding the Superfund plan. *See* attached Appendix D, Robinson Foundation Agreement ¶ 1. Pursuant to the contract, the Foundation hired workers to engage in a robust public-advocacy campaign to distribute flyers, make phone calls, knock on doors, and otherwise express the view that the EPA's Superfund plan was scientifically unsound and disastrous as a policy matter. The preamble of the contract made clear that the relationship was subject to federal, state, and local laws, including the Alabama Ethics Law. *Id.* The contract said nothing about Robinson taking any "official action" by using any of the powers of his office to assist Drummond in any way.

The government has now used the contract as the sole basis for indicting Defendants for federal "bribery" in violation of 18 U.S.C. § 1343, 1346 (honest-services bribery) and 18 U.S.C. § 666 (federal-program bribery). The prosecution claims that hiring the Foundation to engage in issue advocacy was part of a nefarious criminal "conspiracy." In particular, the government alleges that Defendants gave the Foundation "monthly payments in exchange for, among other things, favorable official action by Representative Robinson in relation to the environmental issues in north Birmingham." Indictment ¶ 18.

7

The Indictment identifies four basic categories of alleged "official action."

Namely, Robinson was to:

> (1) "communicate[] . . . opposition to EPA's actions to the residents of north Birmingham" without disclosing that his Foundation was "being paid to represent the exclusive interests of Balch & Bingham and Drummond Company."

> (2) "make a public statement and pressure and advise" two state executive agencies, the Alabama Environmental Management Commission ("AEMC") and Alabama Department of Environmental Management ("ADEM"), "to take and maintain a position on behalf of the State of Alabama favorable to Balch & Bingham and Drummond Company in relation to EPA's efforts to list the 35th Avenue Superfund Site on the National Priorities List and expand the Superfund Site";[1]

> (3) "meet with and advise EPA officials to take a position favorable to Balch & Bingham and Drummond Company in relation to EPA's efforts to list the 35th Avenue Superfund Site on the National Priorities List and expand the Superfund Site into Tarrant and Inglenook"; and

> (4) "vote as a member of the State of Alabama House of Representative's Rules Committee to send the joint resolution (SJR97) . . . to the floor of the House of Representatives for consideration by the membership of the House with the recommendation that the resolution be adopted."

Indictment ¶¶ 62, 64.

The government's allegations under section 666 (federal-program bribery), rely on the same four categories of conduct: By paying the Foundation to engage in community education and issue advocacy, Defendants "did corruptly give, offer, and

---

[1]   Although this Motion is directed at the sufficiency of the Indictment, we note that in the FBI memoranda of interview (form 302s), Oliver Robinson, the government's cooperating witness, contradicts the assertion that defendants wanted Robinson "to pressure and advise AEMC and the ADEM Director to take and maintain a position on behalf of the State of Alabama favorable to Balch & Bingham and Drummond Company."   Indictment ¶ 22. Thus the factual underpinnings of the Indictment are weak and the law should not be stretched to protect this particular pursuit.

agree to give" a thing of value to Robinson, an agent of the State of Alabama, "with intent to influence and reward" him "in connection with" some "business, transaction or series of transactions of the State of Alabama involving" something "of value of $5,000 and more." Indictment ¶ 64.

In short, the Indictment alleges that Defendants committed both forms of bribery by hiring and paying the Foundation in exchange for: (1) public advocacy to "the residents of north Birmingham" expressing the view that the Superfund plan should not proceed; (2) a public statement Robinson made to a state executive branch agency and an official in a different state executive branch entity expressing the same view; (3) a meeting with members of a *federal* agency on the topic; and (4) a symbolic committee vote in favor of having the full Alabama House vote on a joint resolution "urging 'the Attorney General and ADEM to combat the EPA's overreach.'" Indictment ¶¶ 38, 62, 64.[2]

## **LEGAL STANDARD**

The Federal Rules of Criminal Procedure require an indictment to be "a plain, concise, and definite written statement of the essential facts *constituting the offense charged*." Fed. R. Crim. P. 7(c)(1) (emphasis added). When the facts alleged in the indictment do not legally constitute the offense charged, a defendant may move to dismiss his

---

[2]   Count One—charging conspiracy to violate Sections 1343 and 666—relies on the same theories as the substantive counts. And Count Six—Money Laundering Conspiracy—is also derivative of the bribery offenses, because it alleges transactions using the proceeds of bribery. Accordingly, the legal viability of all counts is at issue in this motion.

indictment for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). In that case, the district court is "required to dismiss" the indictment. *United States v. Cure*, 804 F.2d 625, 627 (11th Cir. 1986); *see also, e.g., United States v. Bobo*, 344 F.3d 1076, 1086 (11th Cir. 2003) ("[T]he district court erred in failing to dismiss the indictment because it does not state an offense under the health care fraud statute, and thus, as a matter of law, is deficient."); *United States v. Peterson*, 544 F. Supp. 2d 1363, 1371 (M.D. Ga. 2008) (count for extortion by a public official dismissed where conduct alleged fell "outside the scope of the Hobbs Act").

## ARGUMENT

### I. The Alleged Conduct Does Not Constitute Bribery As A Matter Of Law

The two bribery statutes at issue use different language, but both are inapplicable for the same basic reason: The Indictment does not properly allege that Defendants paid Robinson to use *his official powers* to benefit them, which is the corruption these laws target.

#### A. The Indictment Fails To Allege Honest-Services Bribery (18 U.S.C. § 1343, 1346)

In a federal bribery prosecution under the honest-services-fraud statute, 18 U.S.C. §§ 1343, 1346, the government must show that someone paid a public official in exchange for "official action." *McDonnell*, 136 S. Ct. at 2365. Here, Defendants did no such thing. They did not pay Oliver Robinson to exercise any of the powers of his office, but instead hired the Foundation to conduct a public-advocacy campaign regarding the

10

EPA's Superfund plan. Neither the Foundation nor Robinson himself did anything more than engage in constitutionally protected speech expressing their views on the issue, just as any private citizen could have done. This conduct is not criminal because, as the Supreme Court recently held, "[s]imply expressing support" for (or opposition to) a governmental act "does not qualify" as official action. *McDonnell*, 136 S. Ct. at 2371.

The federal wire fraud statute, 18 U.S.C. § 1343, prohibits using interstate wires in furtherance of a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." As interpreted by the lower federal courts over a number of decades, the statute criminalized schemes to deprive individuals, not only of their "money or property," but also of their intangible rights, including their right to the "honest services" of their fiduciaries. Under that meaning of a scheme or artifice to defraud, invoked by the government here, schemes that deprive individuals of those honest services are illegal. Easily stated in theory, the doctrine has proved difficult to apply in practice, as the Courts of Appeals have divided repeatedly over the various elements of the honest-services offense. *See Skilling v. United States*, 561 U.S. 358, 416-20 (2010) (Scalia, J., dissenting).

In *McNally v. United States*, 483 U.S 350, 359-360 (1987), the U.S. Supreme Court temporarily mooted those disagreements by holding that the analogous mail-fraud statute applied only to schemes to defraud others of money or property, not honest services, thereby invalidating the doctrine. But the calm following *McNally* was short-lived. The year after *McNally* was decided, Congress passed 18 U.S.C. § 1346, which

defined the term "scheme or artifice to defraud to include "a scheme or artifice to deprive another of the intangible right of honest services," thus resurrecting the pre-*McNally* honest-services case law.

The doctrine proved no easier to apply the second time around and, in *Skilling*, the U.S. Supreme Court embraced an opportunity to better define its limits. Surveying the vast pre-*McNally* case law, the Supreme Court held in *Skilling* that § 1346 criminalizes only schemes to defraud involving bribery or kickbacks. 561 U.S. at 408-09. Urging a more expansive reading, the government had contended that § 1346 should criminalize schemes involving fiduciaries' undisclosed conflicts of interest, defined as "the taking of official action by [a public official or private] employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a financial duty." *Id.* at 409. The Supreme Court squarely rejected that contention, citing both due process concerns and the "familiar principle that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Id.* at 410 (internal quotations omitted); *see id.* at 409-11 & n. 44.

Confined now to schemes involving alleged bribes or kickbacks, prosecutors continued to push at the limits of the honest-services doctrine. One such effort, the prosecution of former Virginia Governor Robert McDonnell, earned the government a unanimous rebuke from the Supreme Court and generated the precedent that requires the dismissal of the honest-services counts in this Indictment. In *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the Supreme Court identified the important interests that

12

are threatened by overzealous prosecutions or expansive readings of the honest-services doctrine—especially where, as here, the "permissible scope of interactions between state officials and their constituents" are concerned." *Id.* at 2373.

### 1. Bribery Requires "Official Action"

*McDonnell* clarified the type of "official action" required for a federal bribery prosecution. Federal law defines an "official act" as a "decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity." 18 U.S.C. § 201(a)(3). Invoking constitutional avoidance, *McDonnell* unanimously rejected the government's sweeping interpretation of this language and imposed a series of concrete limits. 136 S. Ct. at 2367-73.

*First*, the Court rejected the government's argument that a "question, matter, cause, suit, proceeding or controversy" encompasses "nearly any activity by a public official," including "the typical call, meeting, or event." *Id.* at 2368. Rather, the words "connote a *formal* exercise of governmental power, such as a lawsuit, hearing, or administrative determination." *Id.* (emphasis added). Because "a typical meeting, call, or event arranged by a public official is not of the same stripe" as formal governmental actions, it would "not qualify" as a "question" or "matter" under § 201. *Id.* at 2369. Pursuit of some "broad policy objective," like promoting economic development, is likewise too "nebulous" to qualify. *Id.* at 2374.

*Second*, the Court rejected the government's theory that an official takes "action on" a matter merely by "meeting with other officials" or "speaking with interested parties" to express a particular view. *Id.* at 2370. The Court ruled that "[s]imply expressing support" for a governmental act or arranging a "meeting, event, or call" to discuss it is not itself acting "on" a matter. *Id.* at 2371. Rather, an official who does not *personally* exercise governmental power takes official action only if he "us[es] his official position to exert pressure" on the responsible official, or "us[es] his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act.'" *Id.* at 2370, 2372. To illustrate the latter scenario, the Court cited *United States v. Birdsall*, in which "subordinates"—"more directly acquainted" with the "facts and circumstances"—were bribed to recommend clemency to superiors who "would necessarily rely largely upon [their] reports and advice." 233 U.S. 223, 234 (1914).

In so construing the bribery law, the Court avoided "significant constitutional concerns." *McDonnell*, 136 S. Ct. at 2372. Reading "official act" expansively would have "cast a pall of potential prosecution" over a wide range of legitimate political activity, such as "arrang[ing] meetings for constituents" and "contact[ing] other officials on their behalf." *Id.* at 2372-73. Treating this type of action as potentially unlawful would allow "overzealous" prosecutors to indict officials for political conduct based on nothing more than "prosaic interactions" involving campaign donations or gifts by constituents, thereby chilling "democratic discourse." *Id.* Such a broad reading also would violate federalism principles by transforming federal bribery law into a code of "good

14

government for local and state officials." *Id.* at 2373. With so many weighty considerations in the balance, the Supreme Court emphasized that a statute in the field of public corruption "'that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter.'" *Id.* (quoting *United States v. Sun-Diamond Growers of Cal.*, 526 U 398, 408 (1999)).

## 2.   The Indictment Fails to Allege Official Action

In the present case, Defendants did not commit bribery because they did not pay Robinson to exercise the *official powers of his office*, but instead hired his Foundation to engage in public advocacy in support of their shared policy position regarding the imprudence of the federal government's Superfund plan.

At the outset, the government cannot plausibly argue that Robinson or his Foundation engaged in unlawful "official action" simply by "communicat[ing] . . . opposition to EPA's actions to the residents of north Birmingham." Indictment ¶ 62. Obviously, communicating with one's fellow citizens on a matter of public policy is not a "formal exercise of governmental power" that can be prosecuted as bribery. *McDonnell*, at 136 S.Ct. 2372. And although nearly every instance of public advocacy on a policy issue could be loosely characterized as a type of "advice" or "pressure" on the government, it obviously does not constitute the type of *official* advice or *official* pressure that can be treated as "official action" under *McDonnell. Id.* at 2370, 2372. Otherwise, for example, a state legislator who is paid to write an op-ed for a local newspaper urging

the governor to adopt a new policy could be prosecuted under the federal bribery statutes. That cannot be the law.

The primary theory of the Indictment appears to be that Defendants' payments to the Foundation for its public-advocacy work were truly intended to be payments to Robinson himself in exchange for his meeting with EPA officials and his public statements to the ADEM or AEMC regarding the Superfund plan. But even if the government could prove that Defendants paid Robinson for these activities—which it cannot—this conduct still does not qualify as "official action" under *McDonnell* as a matter of law. *McDonnell* makes abundantly clear that merely attending meetings, speaking with officials, or "expressing support" for a particular view are not official acts sufficient to incur criminal liability. *Id.* at 2371. In meeting with EPA officials and making public statements to the ADEM or AEMC at a hearing, Robinson was not engaging in any "formal exercise of governmental power," *id.* at 2372, because he had no control over what these agencies would do with respect to the Superfund plan—or any other official "matter" that may have come before them.

To be sure, an official who lacks independent authority over a governmental matter can still act "on" it by "using his official position" either to "exert pressure" on the responsible official or to "provide advice" where such advice is expected to "form the basis" for an ultimate decision. *Id.* at 2370-71. The Indictment repeatedly incants the phrase "pressure and advise" in an effort to shield itself against attack. Indictment ¶¶ 21, 22, 64. But "pressure" under *McDonnell* refers to *deliberate exploitation of official*

16

*powers*, and "advice" refers to a superior relying on the counsel of an aide *whose official role is to provide it*. Neither concept extends to unsolicited policy statements simply because the persons who make and hear the statements happen to be public officials. As a result, neither concept encompasses Oliver Robinson's alleged conduct here.

### a.   "Pressure"

As to pressure, courts recognized even prior to *McDonnell* that when an official tries "deliberately to exploit [his] leverage" as a public official to achieve an end, such as by "threat" of legislative retribution, that is "official" action. *United States v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008). But just because an official *has* such power does not make his actions official. *Id.* The Second Circuit has since construed *McDonnell*'s "pressure" rule accordingly, holding that New York legislator Sheldon Silver's efforts to obtain a job at a state-funded nonprofit for the son of his benefactor did not constitute "pressure" as a matter of law because there was "no evidence in the record that Silver or anyone else threatened to withhold [the nonprofit's] funding" if it refused to comply. *United States v. Silver*, 864 F.3d 102, 120-21 (2d Cir. 2017).

Here, the same is true. There is no allegation Robinson used his official powers to exert any "pressure" on the ADEM, the AEMC, or the EPA, because there is no claim he sought to leverage the powers of his office to coerce or cajole them in any way. For example, there is no allegation that he threatened to hold an oversight hearing or withhold agency funding unless the state agencies did what he wanted. To be sure, he may have used his reputation and stature as a lawmaker to lend credibility to his

17

advocacy, but "trad[ing] … on the reputation, network and influence that comes with political office" is not "official action." *Urciuoli*, 513 F.3d at 296. Moreover, while the Indictment alleges Robinson used his "official . . . letterhead" to request the opportunity to make a public statement at the AEMC hearing, ¶ 43, that too did not rise to the level of an "official action" because "using government letterhead is not, by itself, a formal exercise of government power." *Silver*, 864 F.3d at 120. This reasoning applies with equal force to Robinson's references to his constituents. *See* Indictment ¶¶ 43, 58, 59. Although the government makes much of these references, they do nothing to remedy the flaw that undermines the government's theory:  Oliver Robinson did not leverage the powers of his office to apply pressure to ADEM, the AEMC, or the EPA.

> **b.    "Advice"**

Nor was Robinson giving official "advice" to the ADEM, the AEMC, or the EPA. *McDonnell* linked "advice" to the "use" of one's "official position" with an understanding that the decision maker would "necessarily rely" on such advice. 136 S. Ct. at 2370. The Court exclusively cited *Birdsall*, 233 U.S. 223, for this proposition, explaining that the *Birdsall* defendants were "subordinates" who were bribed to advise their "superiors" to grant clemency: a context in which the superiors "'would necessarily rely largely upon the reports and advice of subordinates … who were more directly acquainted with' the 'facts and circumstances.'" 136 S. Ct. at 2370 (quoting *Birdsall*, 233 U.S. at 234). That informs *McDonnell*'s holding: When a subordinate's *official role* is to make "reports" and provide "advice"—*i.e.*, synthesize information and offer a

recommendation, as part of the official decision-making process—the superior will "necessarily rely" on that advice; providing it is thus itself "official." *Id.* For advice to constitute an official act, it must have a legal nexus to the exercise of formal governmental power whose integrity the corruption laws are meant to protect. *See Silver*, 864 F.3d at 122 (not treating Silver's written opposition to a methadone clinic as advice, because he never "formally used his power as Speaker ... to oppose the clinic").

Here, the Indictment does not allege any facts showing that Robinson "us[ed] his official position," *McDonnell*, 136 S. Ct. at 2370, to provide official advice that would have been known or expected to form the "basis" for a decision by the EPA or AEMC. Of course, anyone can advocate a position on behalf of a political ally at a meeting or administrative hearing. But that plainly is not the type of "advice" that *McDonnell* was referring to, because it is not a duty of any state legislative "office." Robinson was no more "advising" the EPA and the AEMC than any other private citizen who could have made the same public statements at the hearing, or advocated the same policy position to the EPA. That a private citizen *could have done the same thing as Robinson* confirms that he was not "us[ing] his official position to provide advice," *McDonnell*, 136 S. Ct. at 2370-71, but, at most, taking a position on an issue before a federal agency and agencies in a different branch of state government. "Taking a public position on an issue, by itself, is not a formal exercise of governmental power, and is therefore not an 'official act.'" *Silver*, 864 F.3d at 122.

There are even more fundamental reasons why the government's "pressure" and "advice" theories are legally deficient. The EPA is a *federal* agency, while Robinson was a *state* official. As a matter of law, state officials (including legislators like Robinson) lack authority to make a decision "on" a matter pending before a federal agency like the EPA. Moreover, with respect to AEMC and ADEM, the Indictment alleges that Robinson did not have any interaction with officials from those entities until February 2015. *Id.* at ¶¶ 56- 58. But the ADEM had already made its formal "request" for EPA to withdraw the NPL Listing Proposal in "January 2015." *Id.* at ¶ 12. (And even before that, the ADEM and the State Attorney General had already informed the EPA of the State's conclusive opposition to the NPL Listing in September and October of 2014—before the alleged "conspiracy" in this case even began. *See* Appendices B, C.) Accordingly, Defendants could not possibly have paid Robinson to influence a "request" to the EPA that the State had *already made*.

### 3. A Symbolic Vote on a Non-Binding Resolution Is Not Official Action

Because none of the statements Robinson allegedly made—to the public, the ADEM, the AEMC, or the EPA—qualify as "official action," that leaves only the single committee vote that he allegedly cast. Specifically, the Indictment alleges that he voted in favor of allowing the full Alabama House of Representatives to consider a non-binding, symbolic resolution "urging the Attorney General and ADEM to combat EPA's overreach." Indictment ¶ 60. That vote alone cannot sustain the Indictment.

As a threshold matter, as memorialized in the FBI 302s of his interviews, Robinson told the government repeatedly that he did not vote or does not remember voting on the joint resolution at all. Robinson also told the government that he never spoke with any of the defendants about the vote or the resolution, which was sponsored by another legislator. Thus, the Indictment's allegation that Robinson voted on the resolution in exchange for payments from Defendants is not supportable.

But even assuming the facts alleged as true, this type of vote on a non-binding state resolution expressing an opinion about a local issue also is not "official action" under federal bribery law. Such a resolution is not a "formal exercise" of the legislature's "governmental power," because it does not make any law or affect anyone's legal rights. *McDonnell*, 136 S. Ct. at 2368. When a state assembly passes such a non-binding resolution, it does not act *qua* legislature, but instead expresses an opinion that has no more legal force than the opinion of a private citizen. What is more, the joint resolution to be sent to the full House for a vote—a resolution merely "urging the Attorney General and ADEM to combat EPA's overreach"—was no different than publicly articulating a broad policy objective or position statement. The Supreme Court explicitly found such conduct to fall on the non-criminal side of the line in *McDonnell*. 136 S. Ct. at 2374.

In any event, the Indictment fails to allege any facts that could prove beyond a reasonable doubt that Defendants paid Robinson *in exchange for* his vote. There is no allegation of any explicit *quid pro quo*, nor even a suggestion that Defendants made any

payment to Robinson himself. Instead, the only allegation is that Defendants hired the Foundation to engage in public advocacy on a related policy issue some six months prior to Robinson casting the vote. This by itself cannot be enough to sustain a bribery indictment, or else federal prosecutors would have license to indict half of the state legislators throughout the country. Alabama is one of 40 states that rely on part-time legislators, many of whom make a living by advocating for clients' interests in their private capacities as attorneys, consultants, or lobbyists.[3]  If they could be prosecuted for bribery every time they supported a non-binding resolution that coincides with the interests of their clients, then they would be stripped of their right to engage in advocacy for private clients in their private capacities—including core *political* advocacy under the First Amendment.

Such sweeping over-criminalization also runs roughshod over Alabama's framework for regulating "the permissible scope of interactions between state officials and their constituents." *McDonnell*, 136 S. Ct. at 2373. Prosecutions for allegedly depriving the state or local citizenry of their right to honest services always implicate federalism concerns, because they threaten to improperly involve "the Federal government in setting standards of good government for local and state officials." *Id.* But they are particularly problematic where, as here, "state law expressly permit[s]" or "d[oes] not forbid" the conduct that allegedly violates federal law. *McNally*, 483 U.S. at

---

[3]  National Conference of State Legislatures, "Full- and Part-Time Legislatures," *available at* https://tinyurl.com/ot324eu.

22

362 n. 9. The Alabama Ethics Law expressly permits legislators to represent clients or constituents "for a fee" before any "executive department or agency," so long as the legislator discloses the representation. ALA. CODE § 36-25-10.

To be sure, Alabama law arguably required Robinson to disclose the business relationship between his Foundation and Defendants within 10 days of the challenged conduct. *See* ALA. CODE § 36-25-10. But Defendants are not public officials charged with violating Alabama conflict-of-interest laws; they are private citizens charged with federal bribery. And the federal bribery laws do not criminalize mere "nondisclosure of a conflicting financial interest." *Skilling*, 561 U.S. at 410. That is what this case is really about. The Indictment repeatedly refers to Robinson's failure to disclose his Foundation's relationship with Defendants. Indeed, U.S. Attorney Jay Town publicly emphasized during his press conference announcing the charges that "[n]ever once did he [Robinson] ever disclose this conflict of interest." Appendix A, Town Tr. at 15. This underscores that federal prosecutors are once again stretching to reach local conduct that they deem improper, but which does not violate federal law.

## B.    The Indictment Fails To Allege Federal-Program Bribery (18 U.S.C. § 666)

For similar reasons, Defendants' alleged conduct also does not constitute unlawful bribery under the federal-program bribery statute. That statute uses different words, but targets the same basic misconduct and must be construed in light of the same constitutional principles that informed *McDonnell*, including the need to avoid

"cast[ing] a pall of potential prosecution" over a wide range of legitimate political activity. 136 S. Ct. at 2372; *see Waste Mgmt of La, LLC v. River Birch, Inc.*, 2017 WL 3279455 at *5 (E.D. La. 2017) (applying reasoning of *McDonnell* to § 666). Indeed, federal-program bribery cannot sensibly be construed more broadly than honest-services bribery, or else the federal bribery laws would apply more strictly to *state* officials than to *federal* ones.

As relevant here, § 666 prohibits payments intended to "influence or reward" an "agent" of a state government or agency, "in connection with" any "business" or "transaction" of that state government or agency, if the state government or agency receives federal funds. 18 U.S.C. § 666(a)(2). Under this text, Defendants' alleged conduct is lawful for two reasons.

*First*, the statute does not reach actions taken by officials who are not "acting within their scope as *agents*" of a state entity in connection with state business. *United States v. Fernandez*, 722 F.3d 1, 14 (1st Cir. 2013) (emphasis added). Thus, while the law covers "a legislator who misuses his legislative authority," *United States v. Sunia*, 643 F. Supp. 2d 51, 67 (D.D.C. 2009), it does not cover a legislator who takes actions *distinct from* his legislative authority. In other words, there must be some use of *official position*. That principle is dispositive here because Robinson's public statements and other actions relating to the EPA's Superfund plan were not taken in his capacity as an "agent" of the state of Alabama "in connection with" any state business. 18 U.S.C. § 666(a)(2). He did not exercise any of the "legislative authority" conferred by his office, and thus

24

his actions were no different in principle than if he had written a newspaper article expressing the same point. This type of non-official advocacy cannot be a predicate for a federal bribery prosecution because it is not the action of a state "agent" "in connection with" state "business." *Id.* It makes no difference whether such non-official advocacy is expressed in a newspaper column, at a meeting with EPA officials, or at a state administrative hearing.

*Second*, the Indictment also fails to state a violation of § 666 because it does not allege that Defendants influenced or rewarded Robinson in connection with any "business" or "transaction" *of the legislature*. Instead, it claims only that Defendants influenced him in connection with the "business" of the ADEM and the AEMC, which are agencies in an entirely different branch of the state government. That does not violate the law.

The statute requires the government to prove intent to influence an agent of the state government "or any agency thereof," in connection with any business or transaction of "*such . . .* government[] or agency." 18 U.S.C. § 666(a)(2) (emphasis added). Accordingly, the official of a state agency must have been influenced in connection with the business of *his or her own* state agency. Here, Robinson was an agent of the state legislature, and thus violated § 666 only if he was influenced in connection with some business or transaction *of the legislature*. But the government barely even tries to shoulder that burden. Instead, it alleges primarily that Robinson was advocating for the ADEM and AEMC to take a particular position on the EPA's Superfund plan. Indeed, the

25

Indictment alleges that the Governor "designated ADEM as the State of Alabama's representative on issues concerning" the Superfund plan. Indictment ¶ 11. But the Indictment does not allege—nor could it—that Robinson was an "agent" of ADEM, or that the Alabama legislature had any formal role to play in the state's response to the Superfund plan.

The government's contrary argument is that Robinson was an agent of the entire "State of Alabama," and that by influencing him in connection with the business of the ADEM and the AEMC, Defendants actually influenced him in connection with the business of *the entire state*. Indictment ¶ 64. This argument is contrary to both the text and purpose of § 666, which operates at the level of discrete state agencies that receive federal funding, and does not cover *all state officials* under the same umbrella. If the agent of a discrete state agency could be treated as an agent of the entire state, then the reference to state "agenc[ies]" would be entirely superfluous, violating the rule that courts "must give effect to every word of a statute wherever possible." *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004). It would also have absurd results: A public-school teacher could then be indicted for working on behalf of a union to lobby the state legislature, on the theory that the teacher was an agent of "the state government" seeking to influence the business of the state.

On this point the Fifth Circuit's decision in *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009), is instructive. The court there reversed a § 666 conviction of two Mississippi state judges who had accepted bribes in connection with pending cases. The

court acknowledged that they were agents of a state agency that received federal funds, the Mississippi Administrative Office of the Courts (AOC). Nonetheless, the government failed to prove that they were influenced in connection with any "business" or "transaction" of the AOC, because the AOC was not officially involved in deciding cases. *Id.* at 345-46. Therefore, because they had not been influenced in connection with the business *of their own agency that received federal funds*, they could not be convicted under § 666. The same is true here: the government alleges Defendants wrongly influenced a member of the state legislature in connection with the ADEM's and the AEMC's business regarding the EPA's Superfund plan. That cannot be a violation of § 666, however, because the legislature played no official role in those agencies' business regarding the Superfund plan.

Indeed, whether one is an "agent" of the relevant entity is determined by state law. *See United States v. Langston*, 590 F.3d 1226, 1237 (11th Cir. 2009) (reversing a conviction under § 666 because the defendant was not an "agent" of the relevant entity); *see also id.* at 1234 ("Because Langston's employment with the Fire College does not authorize him to act on behalf of the state under the applicable state law, evidence of his employment with the Fire College is not relevant to the charges asserting that he acted as an agent of the state."). And, in Alabama, power is constitutionally divided such that a state *legislator* cannot be an "agent" of the State in connection with the business of a state *executive* agency. *See* Ala. Const. § 43 ("[T]he legislative department shall never exercise the executive and judicial powers, or either of them[.]"). At most, a

27

member of the Alabama House could exercise only legislative power, such as voting, but never an "executive" power such as the execution of law by the ADEM or AEMC.

Again, the only thing that Robinson allegedly did that was even arguably related to the business of the state legislature was to cast a committee vote on the non-binding resolution. As discussed above, however, that type of non-binding resolution does not qualify as true legislative "business" because it does not make any law; and in any event there are no factual allegations linking Robinson's vote to any of the payments made by the accused. The vote therefore cannot sustain the § 666 counts any more than it can sustain the § 1346 counts.

## II.   The Indictment Violates The First Amendment And The Rule of Lenity

### A.   The Indictment Fails to Allege The "Explicit" *Quid Pro Quo* Required For An Indictment Based on Protected Political Activity

The First Amendment fully protects Defendants' right to hire a third party to engage in issue advocacy against the EPA's Superfund plan. Indeed, speech opposing a federal regulatory proposal "is at the core of what the First Amendment is designed to protect." *Morse v. Frederick*, 551 U.S. 393, 403 (2007); *cf. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140-41 & n. 21 (1961) (use of a third-party to conduct "a publicity campaign to influence governmental action falls clearly into the category of political activity"). Accordingly, the government cannot prosecute Defendants for hiring the Foundation—or even Oliver Robinson himself—merely to "communicate" with members of the public or government officials about the flaws in the Superfund plan.

28

*Cf. Roberts v. U.S. Jaycees*, 468 U.S. 609, 626-27 (1984) (describing "lobbying" activities as "worthy of constitutional protection under the First Amendment"). *Minnesota State Bd. For Community Colleges v. Knight*, 445 U.S. 271, 308 (Stevens, J., dissenting) ("There can be no question but that the First Amendment secures the right of individuals to communicate with their government."). The First Amendment does not allow the criminal punishment of mere paid advocacy, as opposed to true bribery, which requires a payment in exchange for the exercise of *official governmental powers*.

Although the Indictment claims that hiring the Foundation for advocacy was really a benefit provided to Robinson as a bribe, the First Amendment does not allow such vague and circumstantial allegations to transform protected political activity into criminally indictable conduct. Instead, when a bribery charge rests on an expenditure that is itself protected under the First Amendment, the government is required to allege that the expenditure was "made in return for an *explicit* promise or undertaking by the official to perform or not to perform an official act." *See McCormick v. United States*, 500 U.S. 257, 272 (1991) (emphasis added); *United States v. Siegelman*, 640 F.3d 1159, 1171-72 (2011). At issue in *McCormick* and *Siegelman* were campaign donations, but the independent-advocacy expenditures at issue here are entitled to even *greater* First Amendment protection. *See Buckley v. Valeo*, 424 U.S. 1, 45-46 (1976). Such protected expenditures cannot be the subject of a criminal prosecution unless they are made pursuant to an "*explicit*" agreement "in return for a *specific* official action." *Siegelman*, 640 F.3d at 1171. "In the absence of such an agreement on a specific action, even a close-

29

in-time relationship between the [expenditure] and the act will not suffice" to sustain a bribery case. *Id.*

Here, the Indictment cannot survive under the First Amendment because it does not allege any "explicit" or "specific" *quid pro quo* agreement. Instead it alleges only that Defendants hired the Foundation to engage in protected advocacy against the EPA's Superfund plan, and Oliver Robinson benefited from the advocacy contract while also engaging in unspecified "official" actions. Notably, the Indictment does not (because it cannot) allege that he took any official action as part of any "explicit" or "specific" agreement. The only explicit or specific agreement alleged is the constitutionally protected advocacy contract between Balch and the Foundation. Certainly, there is no allegation of any explicit agreement that Robinson would cast a committee vote in exchange for any payment to the Foundation.  For this reason, the Indictment must be rejected as an improper attempt to punish Defendants for exercising their First Amendment rights to organize an advocacy campaign against the regulatory efforts of a federal agency.

### B.    The Rule of Lenity Prohibits The Government From Stretching the Bribery Code To Reach the Conduct Alleged Here

Even without First Amendment concerns, "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Cleveland v. United States*, 531 U.S. 12, 25 (2000) (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)). Indeed, both the Supreme Court and the Eleventh Circuit have applied the rule of lenity to reject

prosecutions under the very statutes at issue here. *See Skilling*, 561 U.S. at 410–11 (interpreting "scheme to defraud" under § 1346); *United States v. Jimenez*, 705 F.3d 1305, 1309 (11th Cir. 2013) (§ 666); *Cleveland*, 531 U.S. at 25 (§ 1341). The purpose of the rule is to ensure that "fair warning [is] given" about the "line" between innocent and criminal conduct. *United States v. Svete*, 556 F.3d 1157, 1169 (11th Cir. 2009) (en banc) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)). The rule applies with special force "when a broad construction of a criminal statute would 'criminalize a broad range of apparently innocent conduct.'" *Id.* (quoting *Liparota v. United States*, 471 U.S. 419, 426 (1985)).

In the present case, it is hardly "unambiguous" that federal law prohibits *any* of the conduct alleged in the Indictment. Even if the retention of the Foundation to engage in issue advocacy can be recharacterized as a scheme to pay Robinson *personally*, it is far from clear whether his alleged actions qualify as unlawful "official acts" or as "in connection with" state legislative business. During the press conference announcing the charges in this case, the U.S. Attorney himself acknowledged that the contract with the Robinson Foundation itself was legal, admitting that *"the line in the sand is not that I can't hire somebody to consult with me."* Appendix A, Town Tr. at 27. So where *is* the line between protected First Amendment advocacy and a federal felony? Despite the Supreme Court's instruction that "the line should be clear," *McBoyle*, 283 U.S. at 27, the U.S. Attorney conceded that the theory used here blurs the line beyond recognition. He admitted: *"I don't know where the line is, but I know [the charged conduct is] on the other side of it."* *Id.* That is not good enough under Supreme Court precedent. It certainly does not

suffice to sustain an indictment that has already wreaked havoc on the lives of the Defendants, three law-abiding professionals who never for a moment suspected that they might be engaged in criminal conduct.

## CONCLUSION

For these reasons, the Court should dismiss the Indictment in full under Federal Rule of Criminal Procedure 12(b)(3)(B)(v). Alternatively, the Court should dismiss the Indictment in part, limiting the criminal case to the allegation that Defendants paid Robinson in exchange for a committee vote on the non-binding resolution.


Dated: February 16, 2018

Respectfully submitted,

/s/ David Penn Burns                               /s/ Henry W. Asbill
David Penn Burns                                   Henry W. Asbill
GIBSON DUNN & CRUTCHER LLP                         JONES DAY
1050 Connecticut Avenue, NW                        51 Louisiana Ave, NW
Washington, DC 20036                               Washington, DC 20001
Tel: 202-887-3786                                  Tel: 202-879-5414
DBurns@gibsondunn.com                              hasbill@jonesday.com
Admitted Pro Hac Vice                              Admitted Pro Hac Vice

Jackson R. Sharman, III                            Brett Bloomston
LIGHTFOOT FRANKLIN & WHITE                         The Bloomston Firm
LLC 400 20th Street                                2151 Highland Ave. South, Suite 310
North Birmingham, AL 35203                         Birmingham, AL 35205
Tel: 205-581-0789                                  Tel: 205-212-9700
jsharman@lfwlaw.com                                brett@thebloomstonfirm.com

Brandon Keith Essig
LIGHTFOOT FRANKLIN & WHITE
400 20th Street
North Birmingham, AL 35203
Tel: 205-581-0748
bessig@lightfootlaw.com

David Bouchard
JONES DAY
1420 Peachtree St., NE, Suite 800
Atlanta, GA 30309
Tel: 404-581-8386
dbouchard@jonesday.com
*Admitted Pro Hac Vice*

*Attorneys for Defendant David Roberson*

Jeffrey P. Doss
LIGHTFOOT FRANKLIN & WHITE
400 20th Street
North Birmingham, AL 35203
Tel: 205-581-0700
jdoss@lightfootlaw.com

*Attorneys for Defendant Joel Iverson Gilbert*

*/s/ Craig A. Gillen*
Craig A. Gillen
GILLEN WITHERS & LAKE, LLC
One Securities Centre, Suite 1050
3490 Piedmont Road NE
Atlanta, GA 30305
Tel: 404-842-9700
cgillen@gwllawfirm.com

David McKnight
BAXLEY, DILLARD, MCKNIGHT
JAMES & MCELROY
P.O. Box 530333
Birmingham, AL 35253
Tel: 205-271-1100
dmcknight@baxleydillard.com

*Attorneys for Defendant*
*Steven George McKinney*

## **Certificate of Service**

I certify that on February 16, 2018 the foregoing DEFENDANTS' JOINT MOTION TO DISMISS THE INDICTMENT AND MEMORANDUM IN SUPPORT THEREOF has been served on all attorneys of record in the above-captioned case via the CM/ECF electronic filing system.

*/s/ Henry W. Asbill*
Henry W. Asbill

*Attorney for Defendant David Roberson*